I'm Ron Holt, representing Appellants International Junior College and Roger's School of Beauty Culture and I would like to reserve two minutes for rebuttal. Our nation's second president once famously remarked that facts are stubborn things that don't yield to passions or inclinations. And the undisputed facts in this case show that the secretary erred in two ways. First in excluding consideration of something called Cursus Sabatinos courses taken out of the Title IV program with cash paid by poor students, excluded that out of this calculation of the 90-10 percentage for the school. Secondly, we believe the secretary erred in not providing the same relief to this college that he provided to another school called Gibson's Beauty and Barber College. In both cases, the facts show that the secretary erred. Moving to the first point, we do challenge the secretary's application of the regulation and his interpretation of the statute. The statute in question was adopted by Congress in 1992. That statute was originally called the 85-15 rule, now called the 90-10 rule. The purpose of that statute was to require for-profit or proprietary schools to demonstrate they have quality in their programs by attracting students who are willing to pay with their own money. And I quote from the case in Puerto Rico that's cited by the parties in their briefs, Ponce Paramedical College, the court analyzed the intent of Congress as follows, to attract students who will pay for their programs with funds other than Title IV HEA funds. The intent of Congress was to limit Title IV HEA program eligibility to those schools able to attract students who would pay with private funds. And then the court went on and said this, students would be more cautious in spending their own funds than federal funds. They would only attend institutions offering high-quality education and training. So in this case, we have poor students who obviously can't afford, or apparently can't schedule and take at least 12 credit hours a semester. So they're taking one course at a time, they're taking it on Saturdays, they're paying cash. It's undisputed that that's what they were doing, and the courses they were taking were not independent courses or programs. The government's argued in its brief that we're talking about an ineligible program. That's not what we're talking about. We're talking about individual courses like Business 101 taken out of a Title IV eligible program offered by this school, such as Accounting, for example, an Associate's Degree in Accounting. So you just referred to taking a course that was taken out of a program. Correct. And as I understand it, the Commissioner would take issue with your interpretation of the statute there, that what the Commissioner focused on is students who are actually participating in the eligible program, as opposed to simply taking one course out of the program when they're not enrolled in the program itself. If I'm understanding that correctly, why doesn't the statutory language give rise to at least a reasonable interpretation of the statute along those lines, as in the regulation? Well, the statute says, and this is the section that it was in back in 2006, 20 U.S.C. section 1002B1F, it says that a school, a proprietary school, must have at least 10 percent of its tuition, as provided under Subchapter 5. So the references to revenues, we're talking about schools, revenues come from tuition. I think that was the obvious intent of Congress. The Secretary decided to only look at tuition revenue paid by students enrolled in an entire program, as opposed to being enrolled in a course or two. I understand the regulation says that, and I understand that the Secretary has some leeway here to interpret the statute. I just think the interpretation is inconsistent with the intent. And the intent is what I just read to you out of the Ponce Paramedical case, where the court said the intent is to let schools stay in Title IV who are able to attract students willing to spend their own money to get education. We have that intent here. But it actually didn't say to get education. It said to pay for the program. That's not what the court said in the Ponce case. But when we look at the evidence of intent that's in the record that we have in our briefs, for example, from different members of Congress, the idea was that a school had a good enough education that it could attract students who would pay with their own money, which is what we have going on here. And I respectfully submit to you that this is similar to a case that we cited in our briefs, U.S. v. Larianoff. Now Larianoff is a different kind of case. It involved the re-enlistment of veterans, and it was a variable re-enlistment bonus program. And the Supreme Court found that the regulation passed by the VA in that case was inconsistent with the statute. The purpose of the statute was to encourage soldiers, veterans, members of different services with special skills to re-enroll early. The Secretary wrote a regulation that said, okay, if you re-enroll at a time when your skills are special, but later on we decide they're not special, by the time you start your re-enrollment you won't get the bonus. And the Supreme Court in that case said that undermines the certainty. It doesn't allow us to achieve the full result intended by the Congress. And we have the same thing here. When we only look at revenue from programs, and we don't look at revenue from courses that are part of programs, then we exclude student cash like we did in this case, and we lose some schools like we did in this case. We lost International Junior College, a school in Puerto Rico, an admittedly economically depressed area where some people are only going to be able to take one course at a time, go to school on a Saturday and pay cash. Why should the Secretary be able to write a regulation that excludes good schools that are doing exactly what Congress wanted them to do? That's my question to you. So I think it's inconsistent with the intent of Congress. I think that rule should be overturned. Just so I understand, you concede revenues can be understood to be something other than any source of income? Oh, absolutely. And tuition is a good proxy for revenue? Correct. That's what we're talking about. But then you say any monies taken for anybody taking any course has to count as tuition? Any course that's part of a program already approved by the Secretary for Title IV-VIII. And just so I follow the logic of that, once you concede that, why is it unreasonable to cut it slightly differently and say that actually you've got to be a student who's taking that course as part of the enrolled program, enrolled in the program that's getting the aid? Because that sort of interpretation falls harshly and unfairly on schools that serve poor people that are in poor areas. Because I get that. I understand that that's a policy consequence. It obviously also has the potential benefit of further proving that the program that's being aided with federal dollars is a competitive one. It does have that consequence. That's a competing consequence. But I'm really asking a question about why is it an unreasonable interpretation of the statute? Once you concede that revenues can mean tuition, and then once you concede that tuition has to be considered in light of the Title IV program, as opposed to any money for any class no matter what, I guess I'm having trouble understanding what makes it unreasonable to do it. It seems that there's just an ambiguity on that question. Generally under Chevron, we'd let the agency resolve it. Well, we have the intent of Congress to wait, which is that we want to reward schools that offer education that attracts cash-paying students, right? So we have a school that has a Title IV program. It has students in that program, and they are getting Title IV, and some of them are paying cash. But it has other students who can't take the entire program at one time. They enroll one course at a time. They pay cash. As you can see, wouldn't the Secretary be worried that if they didn't require the test to be tuition for people who have actually enrolled in the program, that a school might have an incentive to gain the rule by having a few kids take some classes and pay for it, even though the program wouldn't be worth anything to them? Whereas if the test is you have to be enrolled in the program, that's a pretty good test that it's a viable program even without the aid. That's a test that excludes consideration of students who can't take an entire program in one term, that can't make that commitment, and are going to take one class. Well, that's an effect of it, I guess. I'm just asking what's reasonable about using it as a way of bolstering the objective, which is to ensure that it's a viable program independent of the Title IV funds. Well, Judge Barron, I don't think it's an either-or, as you posit. I think that you can have a situation where the school has Title IV-eligible programs. It's comprised of, let's say, ten different courses, and you require a student who's going to take one course to enroll in it. There is enrollment paperwork here. You keep a transcript, and you gather up credits, and so these are creditable courses that eventually can be added up and turned into a diploma or a degree. That's the evidence in this case from the statement of the officers of the school unrebutted in their declarations in front of the administrative judge, the secretary, and later the district court. So I don't think it's either-or, and I think the secretary's choice is too narrow. I think it defeats the intent of Congress in the case of schools like this that serve a poor population where they're going to have a part of their population taking a course at a time out of that program and paying cash. If I might, Your Honor, move on to the next point, which is that beyond not including this cursus sabatinos cash, the secretary, assuming that the cash can't be included under his regulation shouldn't be included, went ahead and, of course, found the school failed the 90-10 test in fiscal 2005. But he refused to extend to this school the same relief that he extended to another school called Gibson Barber Beauty College. And he exercised that relief in the Gibson Barber case based on a statute that Congress And that particular statute says that the secretary shall permit the institution to correct or cure an administrative accounting record-keeping error if the error is not part of a pattern of error and there's no evidence of fraud or misconduct. Now in the Gibson Barber case, he had a small school, roughly $192,000 in total revenue. They had $3,850 of revenue that went over the 90% portion. The secretary found that that was a small amount. That was one important point to him. Secondly, the secretary found that there was no evidence of any fraud or any other errors, regulatory errors. And third, the secretary found that that small school had attempted to make a cure. The evidence on that point is actually inaccurate. Both the secretary and the district court state that this school actually made a donation of money during the fiscal year in which it went over 90%, the applicable year. But if you read the ALJ's opinion, the Administrative Law Judge's opinion, on page 2, footnote 2 of that opinion, the Administrative Law Judge said that the loan that was made during the fiscal year by the owner of that school wasn't forgiven until over two years later, when in 2005 their auditor was making an audit of their 2004 fiscal year. For that school, the fiscal year at issue where they failed 90-10 was fiscal 2002, so you actually had corrective action occurring two and a half years later. So I just want to clear that up because that is a misleading premise in the record, misleading premise adopted by the secretary and later the district court, that it was necessary to have corrective action within the fiscal year in which you failed 90-10 and that it actually happened in that case. It did not happen. Now if you look at international quickly, you have a range, according to the district court, of excess over 90% between $8,600 and $61,000. In the case of $8,600, that's only one-third of 1% of their total Title IV revenue, which is right around $2,100,000. In the case of $61,000, the upper end of that range, that's two and a half percent. The $3,850 that Gibson Barber was over was 2% of their total revenue. So comparable amounts of revenue, bigger, but percentages were comparable. So in the first factor, we say that exactly the same, these two schools are alike. On the second factor, the secretary and the district court attempt to say there's fraud or a pattern of errors, excuse me, and what they point to is heightened cash monitoring being imposed on the school and secondly, delayed audits. On the first point, there was a letter sent to the school in May of 2006 when their fiscal 2005 audit came out and that letter said, because your audit shows you're over 90%, we're putting you on HCM2. So the HCM2 was not an independent error, it was part of that same thing. And then secondly, they talked about late audits. There were 44% of all schools, all colleges across America that were late in filing their audits in that time period and no action was taken against them. So we would posit that that shows that that's not a fraud point. And finally, the corrective action. The school got back into the Puerto Rico grant program in 2006. It was in that program before 2005. It had compliant 90-10 scores then. It got back into that program in 2006. It had compliant scores afterwards and the owner made a loan of over a million dollars. What more could this school possibly have done to correct the basis for why it was over 90%? And yet the secretary refused to grant the same relief. We say that's arbitrary and capricious. Thank you. Thank you, Carol. Good morning, your honors, and your police court. I'm Jennifer Woodward and I'm here for Arne Duncan, Secretary of the U.S. Department of Education. I'd first like to address the three points that Mr. Holt just made. And I submit to you that he wrongly characterized each one of those points. The first point that he made was that he said that there was evidence to show that the students who were taking the Saturday-only classes were enrolled in classes that could lead to Title IV-eligible programs and that they were taking courses that were merely a part of Title IV-eligible programs. There's no evidence to support that in the record. In fact, counsel conceded when he was given the opportunity, he was given some three extra months to try to find evidence to show that these students were enrolled and they sat side-by-side with other Title IV-eligible students. He could not do so. He also said that Gibson-Barber corrected an error but did something very similar to what International Junior College did, which is, again, incorrect. Gibson-Barber, in fact, the owner made a donation to the school in order to get the school into compliance with the 9010. It was approximately $3,000 short of meeting the 10% of the 9010 calculation. He made a donation in the year in which he knew the school was going to fail. I'm sorry, it was a she. She knew that the school was going to fail in 9010. She later converted that loan to a donation. But she expressly made the donation with the intent of curing the error, whereas International Junior did nothing of the kind. I'm not sure I understand that. You're saying she made a loan that she later converted to a donation? I'm sorry, it was the other way around. Yes, she made a loan and then she later donated the amount to the school. But didn't the donation come after the year of noncompliance? That's true, Your Honor, but she potentially took the corrective action in order to make the school come into compliance. What schools are supposed to do under the 9010 requirement is track their 9010 revenues throughout their fiscal year so they know whether they're meeting the 9010 rule all throughout the year. And so apparently this owner knew that the school was going to have this shortfall, de minimis shortfall, and so she made a loan to the school. How would making a loan be corrective action? That's just shifting funds from one year to another. Well, the Secretary found that as a threshold matter he considered it to be an error that was de minimis and that it was also a record-keeping error or an accounting error. And he also said that he didn't consider as a matter of law the 9010 rule to be something that would be normally able to be corrected or cured, but that in this case his equitable powers allowed him to find that it was such a small amount, the school had a good history with the department, there were no patterns related to this or any other regulatory violations, and so he made in his plenary authority the decision to forgive the liability or to consider it not warranted. Whereas with International Junior College, the school's owner also made a loan, but he made a loan long after the school failed to meet the 9010 requirement, and the crucial difference that the Secretary held was, between the two schools, was that the loan was made in International Junior College's case to keep the school afloat in subsequent years. So, that was the critical difference. He said that the door was not even open for International to enter the facts of the case where he supplied the extraordinary relief. Can we tell from the record whether in Gibson Dunn, whether here the agency cites three distinctions in this case hinged on the correctness of all three of those decisions, or is our finding that any one of them was correct enough without remand? Your Honor, all three of them were correct. Let's assume only one of them or two of them were correct. What should we then do? Should we remand to see if the agency would make the same decision if it knew that only two of the three distinctions were correct, or should we read the agency decision as saying that Gibson Dunn was an extreme, unusual case and you need all three of these factors to apply? Well, first of all, he said the only way that you could enter the door, that was his wordings, was to meet the threshold test of did the record, was there a record keeping account accounting error that could be cured or corrected potentially in a way that would negate the liability, a finding that would require the school to pay money back. And he said that in Gibson Harbor that there was, and that was the threshold before you got to any other factors, and he said I don't need to apply these two other factors to international's case, but I will discuss them anyway. And what's the, I'm sorry, go ahead. I'm trying to figure out what is the threshold accounting error that was present in Gibson Harbor that's different from what we have here? It seems that both situations deal with revenue shortfall as a result of insufficient income from qualifying courses. That's correct, Your Honor. And the difference here as he went on to state was that the corrective action wasn't corrective action meant to satisfy the error. What was it? In international's case, the loan was made to keep the school afloat in years long after the violation had occurred. That was the pivotal distinction. And if in Gibson Harbor it wasn't until two years out that it was converted, how does he reconcile it? But what the secretary said was that the school potentially took action specifically to cure the 90-10 shortfall. And then he went on to say that... Was there evidence in that case of that? How was that something other than speculation? Yes, Your Honor. There was evidence to show that the owner specifically made the loan in order to cure the violation. How could it cure the violation? I just don't quite grasp it. The violation is that you're not getting enough non-title for funds from tuition. Correct. So how does non-tuition revenue cure that? How does that cure it but you can't use revenue from the courses? How is that different? Why should that be different from non-qualifying course revenue? Well, I can only go by what the decision says. But he also found two other pieces, crucial pieces of evidence that were part of this extraordinary relief found at 668.13D. And that was that the amount had to be de minimis. And in order to be considered de minimis, one has to know how much the amount was. Could you try to answer Judge Barron's question? Yes, Your Honor. I can try. The Secretary said that he was going to use his powers to say that the school had made a correction. And apparently the school had determined that it was not going to meet Title IV. I don't know all the... But he can't arbitrarily wield that power. That's correct. And he said that I'm doing this as an extraordinary remedy under these circumstances. This is a good school. No other history of violations. And contrary to International Junior, which failed to submit its audits and audited financial statements timely. And because of that, that's where the 9010 calculation is found. And so the department never had any kind of... Didn't have a school coming forward like in Gibson-Barber admitting it had a shortfall. In fact, the school basically filed its audits late. The department didn't find out. That wasn't one of the three distinctions given, was it? Yes. I thought the three were corrective action being taken through the loan at different times. The cash management... Heightened cash monitoring system of payments. They say it's just a function of whether you do or don't comply with the 9010 rule. Well in this case, it was brought about because the department received the audit late and the audit said... The record showed that, that that's why? Yes, Your Honor. And the audit itself brought attention to the person who was resolving the audit at the department. And it showed that the school had falsely claimed that it met the 9010 requirement because it rounded down its percentage to 90%, which is kind of like the pregnancy rule. You're either pregnant or you're not. You either meet 9010 or you don't. And so he said... Did you only get the cash management tag if you're late in filing? No, there are many, many reasons why schools... If you're just out of compliance, would you get the tag? In other words, if you just don't meet the 9010 thing, would you get the same tag? Well, no. The department would take an action to end a school's participation, or in this case, it didn't even have to end it because the school's program participation agreement was already expired. So all it had to do was deny a new application. So it was taking an even lesser step. The school had already had its participation ended. The department continued the participation so it could try to unravel and figure out the facts as to what was going on with this rounding up and rounding down. So it took the extraordinary step of sending someone to Puerto Rico on site to the school to go through the books and did a sampling of the cash-paying students, just a mere sampling, and found that the school had failed the 9010 requirement by a goodly percentage. And as soon as the analyst found that the school had failed to meet the 9010 requirement, then he brought his evidence forward to the Office of General Counsel and his client office. And that's when the department denied international reapplication for participation. So the key difference here between de minimis, $3,000, and non-de minimis is there was never a finding by anyone as to what the real amount was. You can't say an amount is de minimis if you don't know what it is. So that was a very key point that the secretary ruled upon. Also, he found... Well, because you know what its maximum is. Even if you don't know what it is, you know, it doesn't go over a certain amount. Well, in this case, we didn't know that, Your Honor, because we simply did a sampling of the cash-paying students who were enrolled in these Saturday courses and found that the school failed to meet 9010. And at that point, it was really never the government's burden to have to go to Puerto Rico and test the books. It was international's responsibility to account for its participation in the Title IV programs. And in fact, when the department denied the school's reapplication for certification, the school admitted that it had failed the 9010 requirement. Where do we look to find the answer to Judge Barron's question in terms of exactly what are the terms of the reg pursuant to which you can get on HC2M, whatever it is, HCM2? I'm sorry, what are the... Is there some reg that we can look at that tells us what type of behavior or finding leads to an HCM2 designation? I'd have to think about exactly where that regulation would be. But the Secretary has discretion to place the school on a different method of payment if it has concerns. And in this case, the government, the department, had concerns. The school had lost its eligibility some years ago to participate in the loan programs due to its high corporate default rate, which means students were defaulting on their loan repayments. That was of concern to the government. It was also the late audit, which two in a row, which is a very, very serious violation and results in termination of school's liability standing alone. And that was another point that Mr. Holt made, that he said that the department lets schools get away with this all the time. Well, in fact, the department has taken many, many cases where it's actually terminated a school's participation, not simply denied its reapplication. And if you look at the instances under which schools have been, their applications for pre-certification have been denied, oftentimes you'll see that it's due to late audits. And in fact, that was the number one ground in this particular letter. But Mr. Holt points us to the letter of May 8, 2008 that notified the school that they were on HCM2 method of payment. And as I read that letter, the only reason given by the school was that it's financial responsibilities as the eligibility requirement under the 90-10 rule were not met, period. How do we now find that they were put on it for other reasons? Well, put on it for another reason? No, you're absolutely correct. They were put on it for that reason. And that was to give the department time to figure out what was going on when the school wrongfully rounded down to 90 percent. The department had to go, as I said, to Puerto Rico, look at the books and try to figure out what was going on. So when we look at that reg that's cited in the letter, if I'm understanding you correctly, we should find out you don't automatically get one of these letters merely for missing the 90-10 rule? I'm sorry, which letter? One of the HCM2 letters. So you don't get put on HCM2? No. Normally, if you fail to meet 90-10, your eligibility is terminated. It's as a matter of law. It's a statutory threshold requirement for eligibility in the Title IV programs. So what would normally happen is that a school would receive a letter that would say you are no longer eligible to participate. Can I ask, Gibson-Barber did not get such a letter? An HCM2 letter? No. They never got one, right? But they were not in compliance with 90-10? That's correct. So that's what we're trying to figure out. Does the fact that they got an HCM2 letter make them different from Gibson-Barber or not? Yes. And if both are out of compliance with 90-10, one gets a letter and one doesn't, but the reason you get a letter is because you're out of compliance with 90-10, doesn't seem like a great way to distinguish the two cases because it seems potentially arbitrary that one got the letter and the other didn't. So we're trying to figure out is there some reason Gibson-Barber, though not in compliance with 90-10, didn't get the letter, but International, though also out of compliance with 90-10, did get the letter? Because if there was, that might explain why the Secretary thought it was so significant that International got the letter. Right. There is a huge difference between the two cases. In Gibson-Barber, the school admitted it failed 90-10. In its 90-10 compliance audit, where it puts forth its 90-10 calculation, it said we failed to meet it by $3,000. We'd like to try to correct this problem. We're not eligible for that purpose. And under those circumstances, even though the underlying administrative judge found the school ineligible to participate, the Secretary said, I'm going to use my equitable powers to say this is a school that's been a good school, has had a history of being a good school, it had a shortfall. The owner attempted to correct this, what he considered to be a record-keeping error, and so therefore the school never was put on HCM-2. Here we had a school that never notified the department until several months after it was supposed to, and it didn't say it failed. It said we met the 90-10 rule. Can we find this in the record in this case? I'm sorry? Can we find this, these points in the record in this case? Because the letter we have about why they're on HCM-2 doesn't refer to any of this. You can find it in the briefs. You can find it in the letter that the school that came, excuse me, that said to the school, we are denying your reapplication for certification. All those reasons are laid out in great detail, and then the school asked for reconsideration, but it didn't come forward with evidence, as it was invited to, to show how the department's evidence was wrong. In fact, it conceded that it failed the 90-10 ratio by 93 point some percent, and so is all it did was to say, we're going to use say, we're offering some proposals to you, three different proposals. We'll pay part of the money. We'll, if you grant us reinstatement, retroactive to the period to where we lost eligibility, several, there were three proposals, and none of them were found to be adequate by the department. And so the department wrote a second letter explaining all the reasons why it was rejecting the school's offers to make part of the payments, have another company come in and take over the school, and the department invited that other school to file an application. The school never did, and the department answered everything that it needed to answer in response to International's claims, but nowhere in the letter where International was supposed to rebut the department's claims that it had failed 90-10 did it do so. In fact, it conceded. Thank you, Counselor. Thank you, Your Honors. First, the regulation in question you were asking about is 34 CFR 668.162. It's part of the Secretary's cash management regulations. It's very broadly written. It says that whenever the Secretary feels there's some reason to convert a school from what's called advanced funding to heightened cash monitoring level two, he can do it. The reasons are identified in the letters, and so you've already alluded to the May 8 letter, which identifies May 8, 2006. The reason was because the school was determined to be over 90%. Counsel for the government keeps referring to my client as manipulating the number. Well, that was the auditor, and they didn't manipulate. They thought you could round it down. They were wrong, but it was 90.23, I think, and they rounded it down to 90%. Once they were informed they were wrong with the letter from the Secretary, they asked their auditor to go back and check the cash receipts, which led to the auditor saying, okay, there's some additional cash receipts, and he included those CURSOs that are now the subject of dispute, and it was clear that we were under, at that point. And then the government sent their auditor, Michael Frohla, who went down there and he looked at 55 of the largest cash payment student files, and out of those 55 he found 34 that were only Saturday attenders. And by the way, there were a lot of people going to school on Saturday. Some were just these one course at a time people, and some of them were students enrolled in a program, because some of these courses were offered that they were taking on Saturday. So that's why out of the 55 largest cash files, Michael Frohla found 34 that were just Saturday students. But let me go back, if I could please, real quickly to corrective action. Okay, the government says that that's not in the record. What's that? What I just said? About the Saturday courses. No, it's in Michael Frohla's declaration, which is part of the record, and it's at JA1464 to JA1466, I believe, where he looked at those CURSOs. And then you'll also find in the record declarations from the former president of the school, Ruben Luna, from my client Edgar Morales, who is here, former vice chairman of the board, and then also from another individual, Rafael Del Cordo, who was a professor at the school. He talks about these Saturday courses and how they're part of the Title IV programs. But back to the corrective action. You correctly noted that alone is not tuition revenue, which is what the administrative law judge said. So even if you could consider it, it's still not tuition revenue. It doesn't really correct it. Correction would be coming up with more money from a source other than Title IV for tuition. That's what happened here. The school got back into the Puerto Rico grant program. It's in the record. Our fiscal 2006 financial statement is in the record. It shows the school reentered that grant program. And what happened is those grant dollars supplanted some of the federal dollars. So because students were getting Puerto Rico grants, up to about 600 a student per term, per year, they were borrowing or taking less, excuse me, from the federal government. They were getting smaller Pell grants. And that's why the school's percentage for fiscal 2006 came back under 90 percent. It was 88.98. So this school corrected the problem, whereas Gibson Barber didn't. All they did was make a loan and later, two years later, forgave the loan. And that doesn't really add tuition revenue. It's just money from an owner, right? But this is money that students got because the school got back into the grant program. That was completely ignored by the secretary and by the district court, but it is in the record in spades. And if you need me, I'll send a letter and give you all the places in the record where we raised that below in the administrative proceedings and in front of the district court. It's been totally ignored. So that's the real corrective action here. And as far as this whole thing about heightened cash monitoring, you know the answer there. It was imposed simply because in 1910, late audits, yes, there were two late audits. We're not saying that late audits are a good thing, but I cited in my brief to an OIG report issued, I believe, in 2010 that found that during this time period, 2004 to 2008, over 3,000 institutions across America were late in their audits. The OIG criticized the secretary for doing nothing about it. So it's a little hollow for the secretary to come in here and tell you an important distinction between Gibson Barber and International is International had two late audits. When during that time period, they weren't doing anything. Thank you very much for your attention and your indulgence.